In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 17-2597 & 17-2688

BROCK INDUSTRIAL SERVICES, LLC,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

LABORERS' INTERNATIONAL UNION
OF NORTH AMERICA CONSTRUCTION
& GENERAL LABORERS LOCAL 100,

*Defendant-Appellee/*
*Cross-Appellant.*

———————————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 16-CV-780-NJR-DGW — **Nancy J. Rosenstengel**, *Judge*.

———————————

ARGUED APRIL 11, 2018 — DECIDED APRIL 8, 2019

———————————

Before BAUER, SYKES, and BARRETT, *Circuit Judges*.

SYKES, *Circuit Judge*. Brock Industrial Services, LLC, is an Illinois-based provider of industrial services, including scaffolding, painting, insulation, and shoring. In January

2016 it entered into a labor agreement with Local 100 of the Laborers' International Union[1] ("the Laborers Union" or "the Laborers"). The agreement requires arbitration of grievances and establishes a bipartite arbitration procedure for resolving most disputes. But work-jurisdiction dis-putes—disputes over whether the Laborers or another union is entitled to perform work—are instead subject to a tripar-tite arbitration procedure involving the company and the contending unions.

Sometime prior to signing the agreement, Brock hired the Laborers to perform scaffolding work at a chemical plant. On the day after the agreement became effective, Brock informed the Laborers Union that it was reassigning the work to the International Brotherhood of Carpenters ("the Carpenters Union" or "the Carpenters"). Invoking the bipartite arbitration procedure, the Laborers Union filed a grievance with the Grievance Review Subcommittee of the National Maintenance Agreement Policy Committee ("the Subcommittee"). Brock responded that the grievance in-volved a work-jurisdiction dispute subject to tripartite arbitration and therefore the Subcommittee lacked authority to arbitrate the matter. The Subcommittee disagreed and sustained the grievance.

Brock filed suit under section 301 of the Labor Manage-ment Relations Act, 29 U.S.C. § 185, seeking to vacate the Subcommittee's decision. The Laborers Union responded with a request to enforce the decision. After a flurry of motions on both sides, the district judge determined that the

---

[1] Formally, the Laborers' International Union of North America Construction & General Laborers Local 100.

Subcommittee had authority to resolve the dispute and issued an order enforcing its decision. Brock appealed. Under the mistaken impression that the judge had denied the motion to enforce, the Laborers Union also appealed.

We reverse. At bottom, this grievance concerns which of two unions was entitled to perform the scaffolding work at the chemical plant. That's a jurisdictional dispute, and the labor agreement calls for tripartite arbitration of jurisdictional disputes. Accordingly, the Subcommittee had no authority over the matter and its decision must be vacated.

## I. Background

Brock and the Laborers Union entered into a labor agreement effective January 7, 2016. The agreement provides: "Except for jurisdictional disputes and those involving general wage rates, all disputes and grievances arising out of work performed under this [a]greement … shall be resolved" through the procedures outlined in Article VI. Article VI requires Brock and the Laborers to submit unresolved grievances to the Subcommittee for arbitration. We refer to this grievance process as bipartite arbitration.

Article I of the agreement provides a separate procedure for resolving work-jurisdiction disputes. A work-jurisdiction dispute is "a dispute between two or more groups of employees over which is entitled to do certain work for an employer." *Hutter Constr. Co. v. Int'l Union of Operating Eng'rs, Local 139*, 862 F.2d 641, 644 (7th Cir. 1988) (quotation marks omitted). Under Article I of the labor contract, unresolved work-jurisdiction disputes must be submitted to a Permanent Umpire. Because this process typically involves

three parties—the employer plus the two competing un-ions—we refer to it as tripartite arbitration.

Prior to signing the agreement, Brock assigned several Laborers to construct scaffolding at the Afton Chemical Plant. On January 8, 2016—the day after the operative labor agreement became effective—Brock notified the Laborers Union that its services were no longer required because the project was assigned to the Carpenters Union. On January 11 the Laborers Union sent a letter to the National Maintenance Agreement Policy Committee claiming that Brock violated the agreement when it reassigned the work to the Carpenters. On January 21 the Laborers notified the Carpenters Union of a work-jurisdiction dispute between the unions over the project.

Invoking the bipartite arbitration procedure specified in Article VI, the Laborers filed a grievance with the Subcommittee complaining that Brock violated the agreement by terminating the Laborers and assigning work to the Carpenters. The grievance requested reinstatement and backpay as a remedy. Brock responded that the Subcommittee had no arbitral authority over the grievance because it constituted a work-jurisdiction dispute and requested that the grievance be dismissed or denied.

The Subcommittee denied Brock's request and sustained the grievance, finding that Brock violated Article I, Section 5 of the labor contract. That provisions states: "During the existence of the [a]greement, there shall be no strikes, lock-outs, work stoppages, or picketing arising out of any juris-dictional dispute. Work will continue as originally assigned, pending resolution of the dispute." The Subcommittee

determined that Brock violated this section by making "a change of assignment."

Brock brought this suit under section 301 seeking to vacate the arbitral award as void because the grievance constituted a jurisdictional dispute and thus was outside the Subcommittee's arbitral authority. A bevy of motions followed. The Laborers moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure; Brock moved to vacate the award; the Laborers moved to "dismiss" the motion to vacate on timeliness grounds; and the Laborers moved to enforce the award.

The judge denied all four motions. She acknowledged that the Subcommittee lacked arbitral authority if the grievance concerned a jurisdictional dispute. She concluded, however, that if the grievance concerned *both* a jurisdictional dispute *and* a wrongful-termination claim, then the Subcommittee could properly adjudicate the latter dispute. But a material issue of fact—namely, whether the Laborers were ever assigned the project to begin with—prevented the judge from resolving the case at that time.

Brock sought reconsideration, and the Laborers moved for summary judgment. The judge denied reconsideration and entered summary judgment for the Laborers Union, ruling that Brock had indeed assigned the scaffolding work to the Laborers and the Subcommittee's decision is enforceable. Both sides appealed.

## II. Discussion

We review a summary judgment de novo. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 849 (7th Cir. 2015). We begin by addressing the Laborers' cross-appeal, which seeks

review of the judge's initial order denying the motion to enforce the arbitral award. The cross-appeal rests on the mistaken assumption that the judge never issued an order enforcing the award. But the summary-judgment order clearly states that the "award is enforceable as a matter of law." Because the Laborers prevailed, we dismiss the cross-appeal.

With that out of the way, we turn to the main event: Brock's argument that the Subcommittee lacked the authority to arbitrate the grievance because it raised a work-jurisdiction dispute. "[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quotation marks omitted). "[T]he question of arbitrability— whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." *Id.* at 649.

By signing the agreement, Brock agreed to submit some disputes—but not all—to arbitration by the Subcommittee. Article VI of the agreement creates a bipartite arbitration procedure and vests the Subcommittee with arbitral authority. Subject to two exceptions, the bilateral procedure applies to "all disputes and grievances arising out of work performed under [the] [a]greement involving the meaning or interpretation of any provision in [the] [a]greement." Jurisdictional disputes are one of the exceptions. Article I creates a separate, tripartite arbitration procedure to resolve work-jurisdiction disputes and vests arbitral authority in the Permanent Umpire rather than the Subcommittee. Accord-

ingly, the Subcommittee exceeded its authority if the grievance raised a work-jurisdiction dispute.

The gravamen of the grievance is work jurisdiction. The grievance and its supporting documents all complain that Brock improperly assigned work to the Carpenters instead of the Laborers. The Grievance Form Fact Sheet demanded that Brock "make proper assignment of work to the Laborers' Union," "reinstate the Laborers," and compensate workers for "lost wages and benefits." Indeed, the Subcommittee sustained the grievance because Brock "made a change of assignment." In other words, the Laborers complained (and the Subcommittee found) that Brock assigned work to the wrong union. That's the definition of a jurisdictional dispute. The Subcommittee therefore had no authority to arbitrate the grievance. The contract required tripartite arbitration in which the competing unions and the employer could be heard.

Our previous decisions amply support this conclusion. In *Local 416, Sheet Metal Workers International Ass'n v. Helgesteel Corp.*, 507 F.2d 1053 (7th Cir. 1974), Helgesteel Corporation (a contractor) and the Sheet Metal Workers were parties to a labor contract that provided for tripartite arbitration of jurisdictional disputes in Article XI and bipartite arbitration for almost all others in Article X. *Id.* at 1054–56. A dispute arose when Helgesteel reassigned work to an Ironworkers' union. The Sheet Metal Workers filed a grievance under Article X complaining about this reassignment; the arbitrator sustained the grievance and awarded damages. When Helgesteel refused to pay, the Sheet Metal Workers filed suit in federal court to enforce the award. Helgesteel told the Ironworkers it would likely need to give the work back to

the Sheet Metal Workers, so the Ironworkers filed their own grievance, which the arbitrator sustained. *Id.* The Ironworkers then filed suit in federal court seeking to compel the Sheet Metal Workers and Helgesteel to submit the entire controversy to tripartite arbitration. *Id.* at 1055.

We held that the entire controversy constituted a jurisdictional dispute requiring tripartite arbitration. *Id.* at 1057. The Sheet Metal Workers insisted that the agreement permitted them to seek damages under the bipartite process of Article X even if tripartite arbitration was also required under Article XI. *Id.* at 1058. We rejected that argument, explaining that such an interpretation of the contract "would allow inconsistent final arbitration awards; the national joint board may say that the work should be assigned to the ironworkers while the local joint board has awarded damages to the sheet metal workers." *Id.*

Likewise, in *William Charles Construction Co. v Teamsters Local Union 627*, 827 F.3d 672 (7th Cir. 2016), we confronted a similar agreement featuring bifurcated arbitration procedures. The William Charles Construction Company performed work on a highway expansion for the State of Illinois. *Id.* at 674. During construction, a dispute broke out between the Teamsters and the International Union of Operating Engineers Local 649 over who was entitled to operate the trucks required for the excavation work. The Teamsters initiated tripartite arbitration, arguing that the work had been improperly assigned to the engineers. The arbitrator ruled in the Teamsters' favor but awarded no backpay or damages. *Id.* The Teamsters then filed a second grievance under bipartite arbitration, complaining again of the improper assignment but this time seeking damages. *Id.*

at 676. The second arbitrator also sided with the Teamsters and awarded lost wages and benefits. *Id.* at 677. The company filed suit seeking a declaratory judgment that the second award was void. *Id.* We agreed that the second grievance was not arbitrable because it was jurisdictional in nature and therefore not subject to bipartite arbitration. *Id.*

So too here. The Laborers Union complains that Brock improperly reassigned the project to another union, so the grievance must be resolved in tripartite arbitration. Allowing the Laborers to seek damages through bipartite arbitration could produce "inconsistent final arbitration awards," *Helgesteel*, 507 F.2d at 1058, so the Subcommittee lacked authority and its award must be vacated.

This conclusion accords with the reasoning of cases in which we declined to find a jurisdictional dispute reserved for tripartite arbitration. For instance, in *Hutter v. Local 139*, 862 F.2d 641, Hutter (a general contractor) had a labor agreement with the International Union of Operating Engineers ("the Operators" or "the Operators Union"). *Id.* at 642. The agreement gave the Operators exclusive jurisdiction over most forklift jobs in Wisconsin; it also provided that work could be subcontracted only to signatories to the agreement. When Hutter was awarded work on a prison contract in Oshkosh, it subcontracted the masonry work to BDI, which was not a signatory to the agreement. BDI thereafter assigned forklift duties to the Wisconsin Laborers District Council and Laborers Local Union No. 1086 rather than the Operators. The Operators Union submitted a grievance to bipartite arbitration, complaining that Hutter had improperly subcontracted the work to a nonsignatory. *Id.*

The arbitrator agreed and ordered backpay, and the Operators filed suit in federal court to enforce the award. *Id.* at 643.

Hutter argued that the Operators' grievance was really a "disguised jurisdictional dispute" subject to tripartite arbitration and that the bipartite arbitration award should be vacated. *Id.* We disagreed, concluding that the *subcontracting* grievance "was a distinct non-jurisdictional claim" because it did not turn on who was ultimately assigned the work. *Id.* at 644. For example, BDI could have assigned the work to the Operators, and in that case there would have been no jurisdictional dispute even though Hutter violated the subcontracting provision. *Id.* Because the subcontracting dispute was nonjurisdictional, the arbitrator had the authority to resolve the grievance under the bipartite procedure. *Id.* at 645.

Although *Hutter* held that the dispute in question was nonjurisdictional, its reasoning supports the opposite conclusion here. We emphasized in *Hutter* that the subcontracting grievance "arose independently" of the work assignment; its validity was "not dependent upon the identity of the party that ultimately performed the forklift work." *Id.* at 644. In contrast, here the Laborers' grievance is *entirely dependent* on the work assignment. Under the reasoning in *Hutter*, the Laborers' grievance is really just a "disguised jurisdictional dispute." *Id.* at 643.

Our conclusion finds additional support in *Miron Construction Co. v. International Union of Operating Engineers, Local 139*, 44 F.3d 558 (7th Cir. 1995). The facts there are strikingly similar to those in *Hutter*. Miron (a general contractor) signed a labor agreement granting the Operators Union exclusive jurisdiction over forklift jobs in Wisconsin

and stipulated that work could be subcontracted only to signatories to the agreement. *Id.* A dispute arose when Miron twice subcontracted work to nonsignatories, each of which assigned forklifting work to the Wisconsin Laborers District Council. *Id.* at 561. The Operators filed grievances under the bipartite procedure complaining that Miron had violated the subcontracting provision. The Laborers District Council filed its own grievances to resolve the proper work assignment and threatened to strike. This threat got the NLRB involved, which held a § 10(k) hearing to resolve the jurisdictional dispute. The Board eventually awarded the first project to the Laborers District Council. *Id.*

Miron filed a complaint in federal court seeking tripartite arbitration. *Id.* at 561–62. We affirmed the district court's denial of that relief. While the Laborers' grievance concerned work jurisdiction, the Operators' grievance alleged only a subcontracting violation. And under *Hutter* a subcontracting dispute is distinct and independent of a jurisdictional dispute. *Id.* In a subcontracting grievance, "[t]he identity of the employees who ultimately perform the work is irrelevant." *Id.* at 566 (citing *Hutter*, 862 F.2d at 644). A subcontracting grievance does not conflict with a work-jurisdiction award so long as there is no "demand that the subcontractor reassign the work … . Since the subcontractor has complete control over which union actually performs the work, maintenance of an action against the general contractor cannot be viewed as a veiled attempt to force a reassignment of the work." *Id.*

*Miron* too is factually distinguishable from this case, though like *Hutter* its reasoning supports our conclusion. In *Miron* we focused on whether the bipartite proceeding could

generate an award that conflicts with the resolution of a jurisdictional dispute. A bipartite arbitration award is valid so long as the grievance "cannot be viewed as a veiled attempt to force a reassignment of the work." *Id.* Here the Laborers *explicitly* attempted to force reassignment—the union demanded that Brock "make [a] proper assignment of work [back] to the Laborers' Union."

One case cuts in the opposite direction. In *Alberici–Eby v. Local 520, International Union of Operating Engineers*, 992 F.2d 727 (7th Cir. 1993), we affirmed awards entered in bipartite arbitration for improper work assignment. Alberici–Eby (a general contractor) hired six unions to construct a lock on the Mississippi River in Illinois. *Id.* at 728. The unions made competing claims to each part of the work, and Alberici–Eby did its best to divide the work fairly. *Id.* at 729. After the project was completed, two unions—the Engineers and the Laborers—filed separate grievances under their respective collective-bargaining agreements alleging that Alberici–Eby had improperly assigned their work to other unions. Alberici–Eby responded that the grievances raised jurisdictional disputes, so the arbitrators had no authority to hear them. *Id.* One arbitrator heard the Engineers' grievance and decided in their favor, and a second arbitrator heard the Laborers' grievance and refused to stay the proceeding. Alberici–Eby then filed suit in federal court asking that the judge set aside the first arbitrator's award, stay the proceeding before the second arbitrator, and require any unions seeking relief to submit to multiparty arbitration to settle the jurisdictional dispute. *Id.*

We denied Alberici–Eby's request. We first noted that Alberici–Eby failed to timely invoke the multiparty arbitra-

tion mechanism even though it "was on notice that it faced the strong possibility of conflicting arbitral awards." *Id.* at 730. We then determined that the first arbitrator had authority to resolve the Engineers' grievance. *Id.* at 733. The relevant labor agreement created a separate arbitration process for jurisdictional disputes, but we noted that the agreement "[did] not tell us whether the subject of the grievance … was or was not a jurisdictional dispute." *Id.* However, the agreement provided that "any difference or dispute arising out of the interpretation or application of any of the provisions contained in th[e] [a]greement" was to be decided by an arbitrator. *Id.* The agreement further provided that the Engineers had exclusive jurisdiction over the relevant work, so we concluded that the dispute "ar[ose] out of the interpretation or application of the [agreement]." *Id.* We also refused to stay the proceedings before the second arbitrator, again emphasizing that Alberici–Eby failed to timely invoke multiparty arbitration, so it "would be manifestly unjust to deny the Laborers an opportunity to be heard by way of bipartite arbitration." *Id.* at 734.

*Alberici–Eby* is hard to reconcile with *Helgesteel*, *Hutter*, *Miron*, and *William Charles*. The grievances concerned work-assignment disputes, but we permitted bipartite arbitration to proceed. We based our decision in part on the language in the agreement between Alberici–Eby and the Engineers, but that language cannot be meaningfully distinguished from virtually identical language in *Helgesteel*. *Compare Alberici–Eby*, 992 F.2d at 733 (providing for bipartite arbitration over "any difference or dispute arising out of the interpretation or application of any of the provisions contained in th[e] [a]greement") *with Helgesteel*, 507 F.2d at 1055 (providing for bipartite arbitration over any "[g]rievance of the [e]mployer

or the [u]nion[] arising out of interpretation or enforcement of th[e] [a]greement").

Because *Alberici–Eby* is an obvious outlier, we limit the case to its peculiar facts. We emphasized there that the contractor waited too long to request multiparty arbitration. That defeated the purpose of the multiparty arbitration process, "which was carefully designed to produce a speedy resolution of jurisdictional disputes in order to permit work to be properly allocated before that work is performed." *Alberici–Eby*, 992 F.2d at 731. The mistake was inexcusable in light of "the strong possibility of conflicting arbitral awards" when the unions filed their separate grievances. *Id.* at 730. Moreover, the project had already been completed. As a consequence the multiparty arbitration would have done little good: "[T]he work ha[d] already been performed," and the multiparty procedure had "no authority to award damages for misassigned work." *Id.* at 730 n.2. We specifically highlighted these facts when we refused to stay arbitration of the Laborers' grievance. *Id.* at 734 ("In … light of Alberici–Eby's failure to move in a timely fashion to achieve multiparty arbitration (assuming that such was available), it would be manifestly unjust to deny the Laborers an opportunity to be heard by way of bipartite arbitration."). None of these circumstances are present here. The Laborers Union notified the Carpenters of the work-jurisdiction dispute ten days after it filed its bipartite grievance. And Brock challenged the propriety of bipartite arbitration at the earliest opportunity.

The district judge offered two reasons to affirm the arbitral award but neither holds up under the caselaw we've just surveyed. First, the judge reasoned that because several

Laborers were already working on the project, removing those workers from the job gave rise to a wrongful-termination claim distinct from the jurisdictional dispute. Not so. The Laborers were terminated because the work was assigned to the Carpenters; a finding of wrongful termination *necessarily* implies that the work was misassigned. That puts this grievance squarely on the work-jurisdiction side of the line. As such, it was subject to tripartite arbitration.

Second, the judge held that the grievance arose out of Article I, Section 5, which provides a separate contractual basis for bipartite arbitrability. The provision in question states: "During the existence of the [a]greement, there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. Work will continue as originally assigned, pending resolution of the dispute."

Grievances arising under this provision are indeed subject to bipartite arbitration. Like the subcontracting provisions in *Hutter* and *Miron*, a dispute under this provision can be separately arbitrated without interfering with a jurisdictional dispute. Suppose for a moment that the Laborers and the Carpenters submitted a jurisdictional dispute to tripartite arbitration, and to pressure Brock into taking its side, the Laborers Union called a strike, prompting Brock to file a grievance under Section 5. It would be completely consistent for one arbitrator to award the work assignment to the Laborers and another to sanction the Laborers for initiating a strike. Neither award would call the other into question.

But bipartite arbitration was not appropriate just because the Laborers labeled the grievance as one arising under Section 5. We look instead to the substance of the grievance. And in substance, this grievance is a work-jurisdiction

dispute. As such, it was subject to tripartite arbitration, and the Subcommittee lacked arbitral authority.

REVERSED; CROSS-APPEAL DISMISSED.